Filed 10/6/15  P. v. Mims CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IVORY JAMAAL MIMS,<br><br>    Defendant and Appellant. | B253030<br><br>(Los Angeles County<br>Super. Ct. No. YA085825) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Alan B. Honeycutt, Judge.  Affirmed.

Edward Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney, defendant and appellant Ivory Jamaal Mims, also known as Derrick Jamahd Rankins, was charged with one count of possession for sale of hydrocodone (Health & Saf. Code, § 11351; count 1), and one count of possession for sale of alprazolam (Health & Saf. Code, § 11375, subd. (b)(1); count 2). Appellant pleaded not guilty.

After a jury trial, appellant was found guilty on count 2. The jury could not reach a verdict on count 1, and the trial court declared a mistrial as to that count. It denied probation and sentenced appellant to three years in county jail. He was given presentence custody credit and ordered to pay various fines.

Appellant timely filed a notice of appeal. On appeal, he argues that (1) the trial court erred in permitting the prosecution to introduce evidence that appellant possessed four other types of prescribed medications; (2) the prosecutor committed prejudicial misconduct; and (3) the trial court committed reversible error when it discharged Juror No. 9 without good cause.

We affirm.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

Dori Rota's (Rota) son, Seth Payares (Payares), had a history of drug abuse. He had a prescription for medical marijuana and entered a drug rehabilitation program in July 2012 for opiate abuse. Rota tried to help her son by getting him an apartment close to family members.

Rota knew that Payares had only one cell phone because she paid the bill. In July 2012, Rota searched through Payares's cell phone for messages about drug transactions. She found text messages dated June 22, 2012, sent by Payares to someone named "D.J." asking for "O.C. and possibly some Xanax and some bud." D.J. responded, "Yea." Rota knew that "O.C." referred to Oxycontin. Both Oxycontin and Xanax were two of the drugs used by her son. In addition to the text messages, Rota also found records of phone calls between D.J. and Payares.

2

Rota conducted an Internet Google search with D.J.'s phone number and found a Craigslist listing advertising a pair of expensive Michael Jordan shoes for sale. The listing also identified D.J. as the contact person. Rota called D.J. and told him that she was interested in buying the shoes for her sons. D.J. told Rota to go to his girlfriend Robbin Roth's (Roth) apartment on Vanderbilt Lane in Redondo Beach to pick up the shoes. She never intended to buy the shoes from D.J.; rather, she was trying to find out who sold drugs to her son.

In October 2012, Rota contacted the Redondo Beach Police Department and told Detective Michael Green that she had information about a drug dealer. She gave Detective Green her son's cell phone and showed him a text message sent to D.J. that said, "So I might want to buy like maybe 60-100 worth of OC. That okay?"

Detective Green used the police data to confirm that D.J. actually lived at the Vanderbilt address. He sent D.J. a text message using Payares's cell phone, pretended to be Payares, interested in purchasing more drugs. Detective Green wrote: "My phone has been broke. You still able to hook me up with some OC or Xanax? I am going to be around tomorrow. I need 100. Or some bud." D.J. replied, "Yea." Detective Green told D.J. that he could only send text messages because the cell phone's speaker was broken. Detective Green chose to send a text message instead of calling D.J. because he did not want D.J. to know that he was not Payares. They continued to exchange text message and ultimately agreed to meet at Rod's Diner on Felton and Artesia.

On October 24, 2012, Detective Green and other police officers were at Rod's Diner waiting for D.J. At some point, Detective Green saw appellant walking towards the diner and arrested him. He had a cell phone that contained the text messages exchanged with Detective Green through Payares's cell phone. Payares's name was saved as "Money Seth iPhone." Appellant did not have any drugs on him. In his pocket, he had keys and insurance papers for a Lexus vehicle belonging to Roth. Detective Green knew that appellant lived not far from the diner, so they went to appellant's residence and found a Lexus parked in front of the building. Detective Green estimated

3

that it would have taken appellant approximately one minute to walk from the diner to the location where the Lexus was parked.

Inside the vehicle, Detective Green found several medicine bottles containing various drugs, including alprazolam and hydrocodone. The pills were in bottles labeled with appellant's name. There were also bottles with another person's name (Emmitt Coneway (Coneway)), but Detective Green explained that it was common for drug dealers to recruit other people for "doctor shopping" in an attempt to obtain more prescription drugs. A small amount of narcotics was also recovered from appellant's apartment. In total, Detective Green recovered 29 tablets of sertraline, 14 tablets of carisoprodol, 88 tablets of alprazolam, 100 tablets of hydrocodone, and 122 tablets of dihydrocodeinone.

According to Detective Green, pain killers and antianxiety medication are very popular in the illicit drug trade because of the high profit margin. These drugs are often purchased legally at a pharmacy by someone with a valid prescription and then sold illegally on the streets. A person addicted to pain killers will often accept substitutions if the particular drug of choice is unavailable.

Detective Green opined that appellant possessed the hydrocodone and alprazolam for the purpose of sale. His opinion was based on the previous exchange of messages between Payares and appellant, Detective Green's exchange of messages with appellant arranging a meeting for a drug transaction, appellant's residence being approximately 100 yards from the location of the drug transaction, the discovery of the Lexus containing the drugs in close proximity to the location of the drug transaction, and appellant's possession of the exact amount of hydrocodone (100 pills) requested by Detective Green.

II. *Defense Evidence*

Nathaniel Green has known appellant for approximately 23 years. In 2009, appellant broke his neck in an accident and was hospitalized. Before the accident, appellant was working as an armed security guard and studying criminal justice in college. Mr. Green had seen appellant spend time with Payares and thought they were friends. Mr. Green used to drive appellant and Payares to a medical marijuana dispensary

4

to purchase various types of marijuana, including Orange Kush, also known as "OC." Roth was Mr. Green's cousin and appellant's caregiver. Coneway was appellant's friend. Coneway had been shot in the face and used narcotics medication. Mr. Green once had a headache and asked appellant for a narcotics medication, but appellant said no. Mr. Green never saw appellant give away any of his medication to others.

Coneway testified that his fiancée is appellant's aunt. He knew that appellant had been involved in a car accident that required appellant to take prescription medication. Coneway was shot in the face when he was younger and is prescribed hydrocodone or Norco for pain and sertraline or Zoloft for his depression. In September or October 2012, Roth drove appellant, Coneway, and Mr. Green to Las Vegas. Coneway left his medication in Roth's car.

Appellant testified on his own behalf. He has been disabled since September 2009 when he was involved in a car accident. Before the accident, appellant was working as an armed security guard and majoring in criminal justice while attending Los Angeles Southwest College. He received approximately $50,000 in a settlement payment from the accident, and he receives $850 monthly for his disability. He has various prescriptions for medications, including hydrocodone and Xanax.

Appellant met Payares in 2008 on Craigslist. He sold him several electronic items over the years. He denied ever selling drugs to Payares. He recalled receiving a text message from Payares's cell phone asking for drugs. Appellant's response of "Yea" was meant to be sarcastic. Appellant thought "OC" referred to the type of marijuana that he smoked, not Oxycontin. He showed up at Rod's Diner to talk to Payares about selling some racing rims for his car.

## DISCUSSION

*I. The trial court did not err in admitting relevant evidence of other prescription drugs*

Appellant contends that the trial court erred in admitting the evidence of other prescription drugs found inside the Lexus where alprazolam and hydrocodone were found.

5

Only relevant evidence is admissible. (Evid. Code, §§ 350, 351.) Evidence is relevant if it tends "to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence." (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) We review the trial court's order on the admissibility of evidence for abuse of discretion. (*Ibid*.)

Here, appellant was charged with possession of hydrocodone and alprazolam for the purpose of sale. Thus, the prosecutor was required to prove that appellant possessed the designated controlled substances with an intent to sell them. As the prosecutor pointed out to the trial court, the evidence that other prescription drugs were found together with the two charged controlled substances was relevant to show that appellant was not a personal user, but rather a drug dealer operating a "pharmacy on wheels."

Moreover, Detective Green testified that an addict of prescription drugs will often accept substitutions if the particular drug of choice is unavailable. The fact that appellant possessed prescription drugs in addition to alprazolam and hydrocodone was relevant to demonstrate that appellant was a drug dealer prepared to offer alternative prescription drugs to meet the needs of his customers. When considered in conjunction with the fact that appellant had just shown up at the diner after exchanging multiple text messages with Detective Green about selling Oxycontin and Xanax, the evidence of the large amount of other prescription drugs found together with hydrocodone and alprazolam was highly relevant and probative of appellant's intent to sell drugs.

Regardless, even if the trial court had erred in admitting this evidence, any such error would have been harmless; it is not reasonably probable that appellant would have received a more favorable verdict in the absence of the alleged error. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) The evidence of appellant's guilt was overwhelming. Rota found text message exchanges between Payares and appellant discussing drug transactions; appellant exchanged additional text messages with Detective Green setting up a drug buy at a nearby diner; and appellant later showed up at the agreed location. When he showed up at the diner, appellant was carrying the keys to Roth's Lexus, which

6

was parked approximately one minute away from the diner. Inside the Lexus, Detective Green found 88 alprazolam tablets and 100 hydrocodone tablets, the exact amount requested in the text message exchange. In light of this evidence, there is no reasonable probability that appellant would have received a more favorable verdict even if the evidence of other prescription drugs had been excluded.

## II. *There was no prosecutorial misconduct*

Appellant argues that the prosecutor committed misconduct when he (1) argued that the case was about Rota's "quest for justice," (2) suggested that appellant had been at a bar "drinking" and "having fun" several weeks before trial, and (3) used improper questioning to insinuate without evidence that prescription drug dealers use multiple doctors and pharmacies.

### A. Applicable Law

Regardless of subjective intent, a prosecutor commits misconduct if he uses "'''''''deceptive or reprehensible methods to attempt to persuade either the court or the jury.'''''" [Citation.]'" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) When attacking a prosecutor's remarks to a jury, a defendant must show a "'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Gurule* (2002) 28 Cal.4th 557, 657.)

The appellate court must "'''not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Gurule*, *supra*, 28 Cal.4th at p. 657.) A prosecutor violates federal due process only if his comments are "'''so egregious that [they] infect[] the trial with such unfairness as to make the conviction a denial of due process.'''" (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284.)

### B. Analysis

#### 1. *Prosecutor's "quest for justice" comments*

Appellant argues that the prosecutor erred in describing this case in his opening statement to the jury as Rota's quest for justice. We see no error. The prosecutor's comments did not simply appeal for sympathy for the victim. Rather, the prosecutor's

comments during his opening statement about Rota's "quest for justice" was a fair summation of the prosecution's theory based on the evidence he intended to present at trial. (*People v. Millwee* (1998) 18 Cal.4th 96, 137.) Rota testified that her son, Payares, was a drug addict, that she found his cell phone containing text messages about a drug transactions, and that she took the initiative to find the person who had sold drugs to her son. Based on Rota's anticipated testimony, the prosecutor reasonably commented on a mother's "quest for justice" for her son. Since the prosecutor's remarks were made in reference to admissible evidence, no prosecutorial misconduct occurred. (*People v. Dykes* (2009) 46 Cal.4th 731, 762.)

For the same reasons, the prosecutor's reference to Rota's "quest for justice" in his closing argument was not improper. "[P]rosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) The prosecutor's argument here was not inflammatory; rather, he stated the obvious and uncontroverted fact that Rota had taken the initiative to locate the drug dealer who sold drugs to her son. (*People v. Young* (2005) 34 Cal.4th 1149, 1195.)

2. *Prosecutor's questions about appellant being at a bar*

Appellant argues that the prosecutor committed misconduct when he asked appellant: "You're aware that a deputy saw you out at a bar a couple of weeks ago one night" without his cane and "you were drinking? Having fun?" The prosecutor then walked over to the deputy in charge of the courtroom and asked her "'what bar?'" According to appellant, through these questions, the prosecutor suggested that despite the injuries he suffered in the car accident, he was "still able to go out and 'party.'" However, the prosecutor never called any witness to support his insinuation.

It is misconduct for a prosecutor to ask a witness questions that suggest facts adverse to the defendant without a good faith belief that the facts are true and could be proven. (*People v. Bolden* (2002) 29 Cal.4th 515, 562; *People v. Mooc* (2001) 26 Cal.4th 1216, 1233.) Here, there is no basis to conclude that the prosecutor did not have a good faith belief that appellant had recently been at a bar drinking and having fun. Even

8

appellant admitted that he was at a bar weeks before the trial without his cane. Thus, no misconduct occurred.

        3. *Prosecutor's questions about prescription drug dealers using multiple pharmacies and doctors*

Appellant contends that the prosecutor committed misconduct when he used suggestive questions to ask appellant about prescription drug dealers' practice of using multiple pharmacies and doctors to obtain prescription drugs without presenting any evidence in support of the inference. Quite simply, no misconduct occurred because the questions were based upon the evidence already presented through the prosecution's expert testimony (Detective Green) and within the permissible scope of cross-examination.

Detective Green testified that it was common practice for drug dealers to engage in a practice called "doctor shopping," by recruiting people to go to different doctors and obtain a large amount of prescription drugs to be sold on the streets for profit. He explained that prescription drugs are obtained legally at local pharmacies and then sold illegally for double or triple the original price on the black market.

Moreover, the prosecutor's questions regarding appellant's practice of going to multiple pharmacies and doctors were well within the permissible scope of cross-examination. (*People v. Chatman* (2006) 38 Cal.4th 344, 382 [permissible scope of cross-examination is broad].) When appellant admitted during cross-examination that he did use multiple pharmacies and doctors to obtain his medication, the prosecutor was entitled to explore the issue further by inquiring about the practice of "doctor shopping," as already described by Detective Green. (*People v. Mayfield* (1997) 14 Cal.4th 668, 754, overruled in part on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)

Appellant also objects to the prosecutor's comment that his personal practice was to go to a single pharmacy. His comment about his own experience offered no negative opinion as to appellant's practice of using multiple pharmacies.

#### 4. *Regardless, any misconduct was harmless*

Even if there had been prosecutorial misconduct, such misconduct would have been harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) If the prosecutor's comments appealed to the jury's sympathy or passions, the trial court instructed the jury with CALCRIM No. 200: "Do not let bias, sympathy, prejudice, or public opinion influence your decision." And, the jury was told that if the attorneys' comments conflicted with the trial court's instructions, then the jury was required to follow "my instructions." The jury was also instructed that the attorneys' remarks during the opening statement and closing argument were not evidence. We presume the jurors understood and followed the trial court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

As for the prosecutor's allegedly improper questions and statements during cross-examination of appellant, the jury was instructed: "Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." The jury was also told that "[n]othing that the attorneys say is evidence." As set forth above, we presume the jurors understood and followed the trial court's instructions. (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)

And, as summarized, the evidence that appellant possessed prescription drugs for sale was overwhelming. In light of all of this evidence, any alleged prosecutorial misconduct would have been harmless as a matter of law. (*People v. Booker* (2011) 51 Cal.4th 141, 186.)

### III. *The trial court properly discharged Juror No 9 for bias*

Appellant contends that the trial court committed reversible error when it discharged Juror No. 9 without good cause.

#### A. Factual Background

On the third day of deliberations, the jury sent a note to the trial court indicating that it could not reach a unanimous verdict on any of the counts, but that it was "much closer on one of the counts." The note also asked: "What should we do if one of the

jurors is biased?" The trial court decided to call each juror individually and inquire about the note.

1. *Interviews of Each Juror*

a. <u>Juror No. 1</u>

Juror No. 1, the foreperson, stated that on the first day of deliberations, Juror No. 9, an African-American male, said, "'They just picked up the first Black guy they could find.'" On the second day of deliberations, Juror No. 9 said, "'It seems like [Payares] should be the one on trial, but I guess he's up resting in Malibu.'" Juror No. 1 told the trial court that Juror No. 9's bias issue had been discussed among other jurors and that the "majority of the jury would agree" that he is biased. When one of the jurors confronted Juror No. 9 about his statements, Juror No. 9 claimed that he was just joking and that he was "looking at the facts as presented."

Juror No. 1 was concerned about Juror No. 9's "inability to stick to the evidence as presented." Juror No. 9 explained to the jury that he was concerned about appellant's lack of a prior arrest record, stating that "someone can't be a criminal unless he or [she] is already a criminal or something." Juror No. 9 also questioned why other witnesses had not been called. Juror No. 1 believed that Juror No. 9's comments about Payares resting in Malibu instead of being on trial reflected "a socioeconomic bias."

b. <u>Juror No. 2</u>

Juror No. 2 said that on the first day of deliberations, Juror No. 9 made a comment about appellant being African-American and that "it's . . . always the Black guy." Juror No. 9 also referred to Rota as "Ms. Mama" who lived in Malibu. Juror No. 2 believed that the comment reflected Juror No. 9's "bias as to the social standing because of the location of where she lived." Juror No. 2 thought Juror No. 9's comment was improper.

c. <u>Juror No. 3</u>

Juror No. 3 stated that Juror No. 9 had made a comment about appellant being Black and that he was being "picked on" and judged because of his color. After the other jurors mentioned that they were instructed not to consider race or national origin, Juror No. 9 said, "'Well, I didn't really mean that.'" But, according to Juror No. 3, it was "in

11

the background of everything [Juror No. 9] said." When the trial court asked whether Juror No. 3 believed that Juror No. 9 was improperly being biased by taking race and socioeconomic status into consideration, Juror No. 3 replied: "Yes, I do."

### d. Juror No. 4

Juror No. 4 stated that on the first day of deliberations, Juror No. 9 brought up race by asking, "'If the defendant wasn't Black would this even be in trial?'" Juror No. 9 also repeatedly mentioned that Payares was "'probably in Malibu just sitting in luxury.'" Juror No. 4 thought that that comment about Payares was improper because "no one was even talking about that."

### e. Juror No. 5

Juror No. 5 said that he did not believe that Juror No. 9 was biased. He recalled Juror No. 9's comment about appellant being African-American. He believed that the comment was improper and that it should not have been part of the discussion.

### f. Juror No. 6

Juror No. 6 said that Juror No. 9 commented about the police arresting a man because of his race. Juror No. 9 also talked about Rota living in Malibu and that she had a lot of money. Juror No. 6 said that Juror No. 9 was advised by at least three to four jurors on multiple occasions that it was improper to consider race and economic status; Juror No. 9 said "it was not an issue."

Juror No. 6 did not believe that Juror No. 9's conduct was improper.

### g. Juror No. 7

Juror No. 7 believed that Juror No. 9 was biased. Juror No. 7 recalled Juror No. 9's comments about "pick[ing] [up] a random African-American male," and that Payares "was probably . . . at his mama's house in Malibu." Juror No. 7 also noted that Juror No. 9 was "not very accepting of the evidence" and that he kept "making excuses." Juror No. 7 also told the trial court that Juror No. 9 made a comment that appellant had been "trapped" by the police.

12

### h. Juror No. 8

Juror No. 8 said that Juror No. 9 "from the beginning had a bias[] about race and class." For example, Juror No. 9 asked "'Well, how come it has to be the . . . Black guy that's on trial?'" He also commented on where Rota was living and said that Payares was "probably living in his mama's house in Malibu." Juror No. 8 believed that Juror No. 9's "mind was set due to issues that are not relevant to the evidence," such as the fact that certain witnesses were not called or certain evidence was not introduced. Juror No. 8 felt that Juror No. 9 was not participating in the deliberation process.

### i. Juror No. 10

Juror No. 10 believed that Juror No. 9 was "very biased." When Juror No. 9 brought up the issue of appellant's "color," other jurors told him that he was "'not supposed to think that way.'" Juror No. 9 responded that he was not making an issue out of it. Juror No. 9 also brought up the fact that Payares's family lived in Malibu; Juror No. 10 thought that this comment indicated a "socioeconomic issue." Juror No. 10 believed that the comment was improper.

### j. Juror No. 11

Juror No. 11 heard Juror No. 9 make a comment about the police believing that appellant was guilty because he was African-American. Juror No. 11 also heard Juror No. 9 comment about Rota living in Malibu and that Payares "must be holed up in her house being taken care of." Juror No. 11 said that Rota's socioeconomic status came up "a few times." Juror No. 11 thought that Juror No. 9's comments were improper. Juror No. 11 also noted that Juror No. 9 was having difficulty with the fact that appellant had no criminal record and that this issue had come up "quite [a lot]."

### k. Juror No. 12

Juror No. 12 thought that Juror No. 9 was biased. Juror No. 12 recalled Juror No. 9 discussing appellant's lack of criminal history to describe appellant's character. He also said that appellant may have been "trapped by the police."

1. Juror No. 9

Juror No. 9 did not think that anyone in the jury had used race as a basis for deciding this case. He explained that a female juror whispered in his ear, "'Is this a Black thing?'" and he responded "'Yeah.'" Juror No. 9 also recalled saying that most of his friends were Black.

He remembered saying that Rota had a house in Malibu, but he denied that it was a socioeconomic problem. He did not recall making a statement about the police picking up appellant because he was Black. Juror No. 9 disagreed with the trial court that the statement demonstrated a racial bias. Upon further explanation by the trial court, Juror No. 9 agreed that although he did not intend to demonstrate a racial bias, his statement "would probably" demonstrate a racial bias.

2. *Trial Court Ruling*

The trial court found that Juror No. 9 had engaged in misconduct by demonstrating both racial and socioeconomic bias, which infected the deliberation process. The trial court also found that Juror No. 9 was not forthright regarding his statements and only acknowledged making the racial statement after being confronted by the court. The trial court noted that it was considering Juror No. 9's use of other factors, such as entrapment.

Juror No. 9 was removed and replaced with an alternate.

B. Applicable Law

The Sixth Amendment guarantee of the right to a fair and impartial jury has been held to entitle "a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence." (*Peek v. Kemp* (11th Cir. 1986) 784 F.2d 1479, 1484.) However, that right "is not absolute . . . and must at times be subordinated to society's interest in just determinations of guilt or innocence." (*United States v. Bates* (9th Cir. 1990) 917 F.2d 388, 392.)

In California, Penal Code section 1089 gives effect to these principles by providing that a trial court may discharge a juror and replace him or her with an alternate if the court finds that the juror is unable to perform his or her duty. (See also *People v. Lomax* (2010) 49 Cal.4th 530, 588.) "A sitting juror's actual bias, which would have

14

supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)

"Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.)

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality test entails a more comprehensive and less deferential review' than substantial evidence review. 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias [or other good cause for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under that demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.'" (*People v. Homick* (2012) 55 Cal.4th 816, 899.)

C. Analysis

Here, there is ample evidence that Juror No. 9 was biased about race and socioeconomic status and that he was improperly considering those factors during deliberations despite the trial court's repeated instructions not to do so. Ten jurors indicated to the trial court that on the first day of deliberations, they heard him make a racial comment about appellant being arrested because he was African-American. Nine jurors heard Juror No. 9 make a comment about Rota and Payares's socioeconomic status because they lived in the affluent neighborhood of Malibu. Ten jurors believed that Juror No. 9 was biased; even Juror No. 5, the only juror who thought that Juror No. 9 was not biased, believed that the comment about appellant being picked up because of his race was improper.

Furthermore, the record establishes that Juror No. 9 was considering evidence outside of what was presented at trial, thereby refusing to follow the trial court's instructions. Juror No. 9 expressed his view that appellant had been a victim of police

15

entrapment even though no such evidence had been presented and no such theory had been argued. Also, Juror No. 9 speculated that Payares was resting "in luxury" at Rota's house in Malibu; no such evidence was presented. Given Juror No. 9's consideration of evidence outside what was received at trial, the trial court did not err in removing him from the jury. (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)

*People v. Allen and Johnson* (2011) 53 Cal.4th 60 (*Allen*) is distinguishable. In that case, a witness testified that he had seen one of the defendants commit murder, even though a time card from the witness's employer indicated that he was at work when the murder occurred. (*Id*. at p. 64.) The witness, who was Hispanic, explained that a coworker had clocked him into work that day, even though he was not actually there. (*Ibid*.) In discussing this testimony, one juror stated that the witness was lying; "I know Hispanics, they never cheat on timecards, so this witness . . . was at work [when the crime occurred]." (*Id*. at p. 66.) The trial court discharged the juror for considering facts outside the evidence. (*Id*. at p. 68.)

The California Supreme Court held that the trial court had improperly excused a juror, reasoning that the juror had not engaged in misconduct; rather, he permissibly applied his life experience to evaluate a witness's credibility. (*Allen*, *supra*, 53 Cal.4th at p. 78.)

In contrast, Juror No. 9 was not just applying life experience to evaluate and assess the evidence. He was refusing to follow the law and deliberate on the matters as set forth in the jury instructions. And, he was considering racial and socioeconomic factors and making speculations outside the evidence.

Appellant's reliance upon *People v. Wilson, supra,* 44 Cal.4th 758 is also misplaced. In that case, a juror was removed during the penalty phase of a capital murder trial. As the sole juror voting for life imprisonment, he made a number of comments concerning race during the penalty phase deliberations. (*Id*. at p. 818.) The trial court found that he had "'concealed his racial biases and fundamental belief in racial stereotypes on voir dire.'" (*Id*. at p. 819.) Thus, he was unable to follow the trial court's instructions. (*Ibid*.) Our Supreme Court disagreed: "The record fails to demonstrate that

16

[the juror] concealed anything. He was never asked whether he would interpret evidence of any abuse defendant may have suffered as a child through the prism of his own life experiences; indeed, we expect jurors to use their own life experiences when evaluating the evidence. [Citation.]" (*Id*. at p. 823.)

In contrast, there is no evidence here that Juror No. 9 was using his own life experience to evaluate the evidence. Rather, the statements from the other jurors demonstrate that Juror No. 9 believed that appellant was being "picked on" by the police because of his race. He also speculated that appellant had been the victim of police entrapment. This speculation is not supported by any life experience in the record of Juror No. 9.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, Acting P. J.
      ASHMANN-GERST

We concur:

_____, J.
      CHAVEZ

_____, J.
      HOFFSTADT

17